**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOSE H. BARAHONA, a/k/a Jose
Herman Barahona, a/k/a Jose
Hernan Barahona,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney
General,

*Respondent.*

No. 11-2046

On Petition for Review of an Order of
the Board of Immigration Appeals.

Argued: May 15, 2012

Decided: August 13, 2012

Before TRAXLER, Chief Judge, and KING and WYNN,
Circuit Judges.

Petition for review denied by published opinion. Judge King
wrote the majority opinion, in which Chief Judge Traxler
joined. Judge Wynn wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Kristina Michelle Campbell, UNIVERSITY OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Petitioner. Ethan B. Kanter, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Tony West, Assistant Attorney General, Civil Division, Michael P. Lindemann, Chief, National Security Unit, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

KING, Circuit Judge:

Petitioner José H. Barahona, a native and citizen of El Salvador, petitions this Court for review of the final order of the Board of Immigration Appeals (the "BIA"), dated September 2, 2011, which affirmed his ineligibility for a "special rule" cancellation of removal under section 203 of the Nicaraguan and Central American Relief Act of 1997 (the "NACARA").[1] Barahona contends that the BIA erred by deeming him ineligible for NACARA relief because he had provided material support to a terrorist organization in the early 1980s by allowing anti-government Salvadoran guerrillas of the so-called "FMLN" (the Frente Farabundo Marti para la Liberción Nacional) the use of the kitchen of his Salvadoran home. As

---

[1]The NACARA, which was enacted in 1997 by Public Law 105-100, 111 Stat. 2160, 2193-96, and amended that year by Public Law 105-139, 111 Stat. 2644, is codified in several titles of the United States Code, including Title 8. *See Peralta v. Gonzales*, 441 F.3d 23, 24 (1st Cir. 2006). The NACARA amended the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which had amended the Immigration and Nationality Act (the "INA") by rendering certain groups of aliens inadmissible. *See Cheruku v. Attorney Gen.*, 662 F.3d 198, 203-04 (3d Cir. 2011). Thus, the NACARA effectively amended the INA, which constitutes this country's basic statutory enactment relating to immigration.

explained below, we reject Barahona's contentions and deny the petition for review.

## I.

### A.

Barahona entered the United States illegally in 1985. He filed his first application for asylum in 1987, pursuant to 8 U.S.C. § 1158(a), and it was denied on July 15, 1988. Barahona was then given thirty days to leave the United States. Barahona nevertheless remained in this country and applied again for asylum in 1995. On May 9, 2007, his second asylum application was referred to an immigration judge ("IJ") for adjudication in removal proceedings. On November 11, 2007, Barahona was arrested in Prince William County, Virginia, and charged with a state felony for maliciously causing "bodily injury to Maria Barahona, his wife, with the intent to maim, disfigure, disable, or kill." J.A. 164-65 (citing Va. Code Ann. § 18.2-51.2).[2] On December 11, 2007, Barahona pleaded guilty to a misdemeanor offense of domestic assault and battery, receiving a term of probation.

In December 2007, Barahona's asylum proceedings were administratively closed for failure to prosecute. His case was recalendared in May 2009 for the resolution of allegations that he was removable under 8 U.S.C. § 1182(a)(6), as an alien present in the United States without lawful admission or parole. During the subsequent IJ proceedings, conducted in late 2009, Barahona was found to be removable, but was accorded an opportunity to apply for a "special rule" cancellation of removal. Such a cancellation of removal is authorized by section 203 of the NACARA, as codified in 8 U.S.C. § 1229b(b), under which the Attorney General is empowered to "cancel removal of . . . an alien who is inadmissible or

---

[2]Citations herein to "J.A.\_\_\_" refer to the contents of the Joint Appendix filed by the parties in this matter.

deportable from the United States, if the alien" satisfies certain criteria, including not being either "inadmissible or deportable" under other provisions of the INA. *See* 8 U.S.C. § 1229b(b), (c)(4). The IJ's evidentiary hearing was conducted on March 22, 2011, and Barahona was the only witness to present evidence.

B.

Barahona testified before the IJ that he was born in 1960 in the city of Carolina, in the San Miguel department of El Salvador. Prior to the outbreak of violence incident to a twelve-year civil war between the military government of El Salvador and the FMLN guerillas, Barahona worked on a small farm in San Miguel. In about 1984, the FMLN guerillas took control of Carolina, and that seizure gave rise to local violence. Due to the FMLN's seizure and frequent labor disputes, Barahona was unable to continue working. For nearly a year, the FMLN guerillas took control of Barahona's home — using it as their needs arose, mainly for preparing food in its kitchen, but occasionally sleeping overnight when the weather was unfavorable.

Barahona confirmed that the FMLN guerillas would arrive at his home and announce that they were going to use the kitchen. He explained that, if he had refused to allow the FMLN access and use of his residence, they would have considered him the enemy. In that event, he would have been given twelve hours to vacate his home city or be killed. Indeed, Barahona's father and cousin had both been executed by the FMLN guerillas, and his father had not been accorded the option of leaving. From early 1984 until Barahona's departure for the United States in February 1985, as many as 200 FMLN guerillas used Barahona's kitchen. They generally utilized the water and cooking facilities of his home, but always brought their own food. On several occasions, Barahona gave the guerrillas directions through the jungle to other locations.

In early 1985, when he was twenty-four years of age, Barahona left El Salvador for this country. In doing so, he travelled by bus through Guatemala and Mexico. Barahona entered the United States in Texas, without being inspected or properly admitted.

## C.

After his March 22, 2011 evidentiary hearing, the IJ rendered an oral decision (the "IJ Decision") denying Barahona's asylum application.[3] The IJ Decision credited Barahona's testimony, and found that the criteria for a special rule cancellation were — except for one — entirely satisfied. The sole INA provision underlying the IJ's rejection of the special rule cancellation specifies that an alien is inadmissible if he has engaged in *terrorist activity* by providing "material support" to a terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I). "Terrorist activity" is defined by the INA, and includes committing "an act that [the person] knows, or reasonably should know, affords material support . . . to a terrorist organization." *Id.* § 1182(a)(3)(B)(iv)(VI)(cc).[4] "Material support" includes providing "*a safe house*, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons . . . , explosives, or training." *Id.* § 1182(a)(3)(B)(iv)(VI) (hereinafter the "Material Support Bar") (emphasis added).

Acknowledging the difficulty of deciding whether Barahona, in accommodating the FMLN guerrillas, had provided material support to a terrorist organization, the IJ Decision nevertheless ruled against him. In so ruling, the IJ concluded that Barahona, in allowing the FMLN guerrillas to use his kitchen for nearly a year, had provided "material sup-

---

[3]The IJ Decision is found at J.A. 322-29.

[4]The parties agree that the FMLN is a terrorist organization for purposes of the INA.

port" under the INA.[5] The IJ accepted the fact that Barahona was under duress when he accommodated the guerrillas, and the IJ recognized that Barahona had no choice but to allow the guerrillas to use his kitchen. The IJ reasoned, however, that there is no exception for duress or involuntariness under the Material Support Bar. As a result, the IJ Decision denied Barahona's application for a special rule cancellation, and ordered Barahona removed to El Salvador.

### D.

Barahona thereafter appealed the IJ Decision to the BIA, asserting three grounds for relief. First, Barahona claimed that allowing the FMLN the use of his kitchen constituted support that was de minimis only, and thus immaterial. Second, he asserted that he was acting under duress and that his support of the FMLN was entirely involuntary. Finally, Barahona contended that the IJ Decision contravened international law. The BIA filed its order on September 2, 2011 (the "BIA Order"), agreeing with the IJ and affirming the IJ Decision.[6]

The BIA Order rejected Barahona's first contention, finding no error in the IJ's conclusion that Barahona's support was material, and agreeing that there is no exception in the Material Support Bar for de minimis activities on behalf of a terrorist organization. Similarly, rejecting Barahona's second contention, the BIA explained that the Material Support Bar "does not contain any language to support an exception to terrorist support where an alien can establish duress or involuntary contributions, and we decline to find one at this time." BIA Order 2. Finally, the BIA declined to find a violation of

---

[5]Although the IJ Decision found that material support was provided to the FMLN by Barahona, the Decision never expressly links that support to any aspect of the statutory definition of "material support." We assume, for purposes of our decision today, that such a link includes at least "a safe house."

[6]The BIA Order is found at J.A. 438-40.

international law. According to the BIA, the INA provides for a discretionary waiver, subject to some limitations, that authorizes the Secretary of State or the Secretary of Homeland Security to grant a waiver of the Bar. *See* 8 U.S.C. § 1182(d)(3)(A). Such a waiver may apply in instances where removal would violate international law. The BIA recognized, however, that "it is well-established that Congress may enact statutes that conflict with international law." BIA Order 2. In the end, the BIA Order dismissed Barahona's appeal.

## II.

Where, as here, the BIA has adopted and supplemented the IJ's decision, we review both rulings. *See Cervantes v. Holder*, 597 F.3d 229, 232 (4th Cir. 2010); *see also Kourouma v. Holder*, 588 F.3d 234, 239-40 (4th Cir. 2009) ("When the BIA and [IJ] both issue decisions in a case, we review both decisions upon appeal."). Pursuant to section 202(f) of the NACARA, "[a] determination by the Attorney General as to whether an alien satisfies the requirements of [cancellation of removal] is final and shall not be subject to review by any court." 8 U.S.C. § 1101; *see Ixcot v. Holder*, 646 F.3d 1202, 1213–14 (9th Cir. 2011) (recognizing that court is precluded from reviewing agency's factual determination that alien is ineligible for special rule cancellation of removal under NACARA). Notwithstanding the foregoing legal principle, a court of appeals has jurisdiction to review constitutional claims and questions of law arising from denials of relief under the NACARA, even though such a court "cannot review discretionary determinations regarding requests for special rule cancellation of removal under NACARA, absent legal or constitutional error." *Gonzalez-Ruano v. Holder*, 662 F.3d 59, 63 (1st Cir. 2011); *see* 8 U.S.C. § 1252(a)(2)(D). Barahona's primary contention in this case — that the Material Support Bar excludes involuntary support, or support of a terrorist organization under

duress — presents a question of law only, as to which we possess jurisdiction.[7]

### III.

In his petition for review, Barahona maintains that his contacts with the FMLN guerrillas do not fall under the Material Support Bar. He asserts that the use of his kitchen by the FMLN guerrillas "occurred under duress, and as such do[es] not rise to the level of providing 'material support.'" Br. of Pet'r 13. Restated, Barahona's position is that he did not provide material support to the FMLN because he was forced, under threat of execution, to allow the guerrillas to use his kitchen.

Barahona admits that the Material Support Bar is silent on whether voluntariness is a requirement thereof. He asserts, however, that such silence renders the statute ambiguous. Relying on *Negusie v. Holder*, 555 U.S. 511 (2009), Barahona argues that we must decide whether a lack of voluntariness is relevant to the Material Support Bar determination. If it is relevant, Barahona argues, the fact that his support of the FMLN was provided under duress precludes the Bar from applying to him.

In its *Negusie* decision, the BIA rejected the claim of an alien that there was a duress exception to the so-called "Persecutor Bar." *See* 8 U.S.C. § 1101(a)(42). The Persecutor Bar prevents an alien from obtaining immigration relief if he participated in the persecution of another person. The BIA's *Negusie* ruling had relied on an earlier Supreme Court deci-

---

[7]In his petition for review, Barahona appears to have abandoned his earlier claim of a violation of international law. Barahona reiterates, however, that his support of the FMLN guerrillas was de minimis and that, as such, it could not amount to material support. Inasmuch as this contention challenges a finding of fact, we lack jurisdiction to reach or address it. *See Ixcot*, 646 F.3d at 1213–14.

sion, *Fedorenko v. United States*, 449 U.S. 490 (1981), which declined to read an involuntariness exception into the Displaced Persons Act. The result of the BIA's *Negusie* ruling was to render inadmissible European refugees after World War II who had served as guards at Nazi concentration camps. The Supreme Court's *Negusie* decision was that the BIA had erred in relying on *Fedorenko* to reject the alien's asserted duress exception to the Persecutor Bar. That is, the *Negusie* Court held that "[t]he BIA is not bound to apply the *Fedorenko* rule that motive and intent are irrelevant to the [Persecutor Bar]." *Negusie*, 555 U.S. at 522-23. As a result, the Court reversed the BIA and remanded for further proceedings.

Unlike the situation in *Negusie*, however, the BIA in this case did not rely on precedent interpreting a different statute when it dismissed Barahona's appeal. Rather, the BIA carefully examined the Material Support Bar and determined that it "does not contain any language to support an exception to terrorist support where an alien can establish duress or involuntary contributions." BIA Order 2. Remaining faithful to the statutory scheme, the BIA declined to read such an exception into the Material Support Bar.

Because the issue before us turns on an interpretation of the INA, we must "afford the BIA deference under the familiar *Chevron* standard." *Midi v. Holder*, 566 F.3d 132, 136 (4th Cir. 2009) (citing *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984)). Under the *Chevron* standard, "we initially examine the statute's plain language; if Congress has spoken clearly on the precise question at issue, the statutory language controls. If, however, the statute is silent or ambiguous, we defer to the agency's interpretation if it is reasonable." *Midi*, 566 F.3d at 136-37 (citations omitted).

The Material Support Bar contains no express exception for material support provided to a terrorist organization either involuntarily or under duress. Congress has created, however,

a general waiver provision for aliens who are otherwise inadmissible. Under § 1182(d)(3)(A) of Title 8, an alien who is inadmissible may seek approval for admission from the Secretary of State or the Secretary of Homeland Security despite his inadmissibility. A statutory limitation is placed on the use of that waiver, however, in that it may not be extended to an alien who has voluntarily supported terrorist activities. *See* 8 U.S.C. § 1182(d)(3)(B). Thus, Barahona, or any similarly situated alien who has supported a terrorist organization under duress, possesses an alternative avenue of relief from inadmissibility.[8] Notably, Congress included voluntary support of terrorist activities in its exception to the waiver provision contained in § 1182(d)(3)(B), but made no distinction between voluntary and involuntary conduct in the Material Support Bar. We therefore assume that Congress did not intend to create an involuntariness exception to the Material Support Bar, otherwise the voluntary support exception to the waiver provision would be rendered superfluous. *See Bilski v. Kappos*, 130 S. Ct. 3218, 3228 (2010) (recognizing "canon against interpreting any statutory provision in a manner that would render another provision superfluous"); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)).

This proceeding bears several similarities to the recent situation faced by the First Circuit in *Gonzalez v. Holder*, 673 F.3d 35 (1st Cir. 2012). Gonzalez petitioned the court of appeals for review of the BIA's denial of a special rule cancellation under the NACARA. The BIA had ruled that Gonzalez was barred from NACARA relief because he had last

---

[8]Barahona's lawyer advised at oral argument that her client had already applied for relief under the waiver provision, and that such relief was denied by the Secretary of Homeland Security in March 2012.

entered the United States as a crewman, and section 240A(c) of the INA (the "Crewman Bar") renders an alien who entered as a crewman ineligible for cancellation of removal. Gonzalez contended in the court of appeals that the Crewman Bar does not apply to an alien who has established eligibility for NACARA relief prior to entering this country as a crewman. As relevant here, the First Circuit declined to read into the Crewman Bar any such exception, holding that "the statute simply does not contain any exceptions. . . . We cannot rewrite the statute." *Gonzalez*, 673 F.3d at 40.

Put simply, the terms of the Material Support Bar encompass both voluntary and involuntary support and, like those of the Crewman Bar, fail to provide for the exception under which Barahona seeks relief. *See De Osorio v. INS*, 10 F.3d 1034, 1042-43 (4th Cir. 1993) (deferring to BIA's permissible statutory construction where statute was silent with respect to exception to "Aggravated Felony Bar").[9] Moreover, Congress has vested discretionary waiver authority in the Secretary of State and the Secretary of Homeland Security for an alien who has provided material support, but has excepted from such a waiver those who voluntarily provided material support. By excepting only voluntary supporters from the waiver authorization, Congress has created an alternative avenue of relief for an alien who is inadmissible because he involuntarily provided material support to a terrorist organization. It was thus reasonable for the BIA, in its decision here, to decline to create an involuntariness exception from the Material Support Bar. We therefore defer to the BIA's interpretation of the Bar, as we must under *Chevron*. *See Asika v. Ashcroft*, 362 F.3d

---

[9]Section 1182(a)(3)(D) of Title 8, which bars the admission of any immigrant who has been affiliated with the Communist or another totalitarian party, contains an exception for aliens who "establish[ ] . . . that the membership or affiliation is or was involuntary." § 1182(a)(3)(D)(ii). The inclusion of this exception in a bar to admissibility, titled "Exception for involuntary membership," provides further support for the proposition that Congress never intended to create an involuntariness exception in the Material Support Bar.

264, 270 (4th Cir. 2004) (recognizing that "we are bound by *Chevron* to defer to the [BIA's] construction of the Act so long as it is reasonable").

In sum, Barahona's support of the FMLN guerrillas falls under the Material Support Bar and his petition for review must be denied, even though that support was rendered involuntarily and was provided to the FMLN guerrillas under duress — namely, the threat of execution. As such, we recognize that our ruling today could be reasonably viewed as yielding a harsh result. Barahona's testimony before the IJ, taken at face value and accepted as credible by the IJ, is compelling in many ways. We are constrained in our disposition of this proceeding, however, by the terms of the Material Support Bar and the BIA's reasonable interpretation thereof. As the First Circuit recently explained, "[w]e cannot rewrite the statute," *see Gonzalez*, and the fact that the BIA has reached a seemingly harsh result does not vitiate the clear statutory provisions. If the governing legal principles are to be altered, that obligation rests with the legislative branch of our government, rather than with the judiciary.

### IV.

Pursuant to the foregoing, we deny Barahona's petition for review.

*PETITION FOR REVIEW DENIED*

WYNN, Circuit Judge, dissenting:

Per the majority opinion, Petitioner José Barahona is ineligible for relief from an order of deportation because over twenty-five years ago, during the twelve-year civil war in El Salvador, he was "forced . . . under threat of execution, to allow the guerrillas to use his kitchen." I, however, would hold that this passive acquiescence to the crimes of terrorists does not constitute an "act" that "affords material support . . .

to a terrorist organization" under the plain language of 8 U.S.C. § 1182(a)(3)(B)(iv)(VI) (the "Material Support Bar"). Accordingly, I must respectfully dissent.

## I.

Under the Material Support Bar, an alien is inadmissible if he has engaged in terrorist activity by providing "material support" to a terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I). "Terrorist activity" is in turn defined to include the commission of "*an act* that [the person] knows, or reasonably should know, affords material support . . . to a terrorist organization." *Id.* § 1182(a)(3)(B)(iv)(VI)(cc) (emphasis added).

As noted by the majority opinion, the statute does not provide any type of "duress" exception for an "act" committed under the type of violence and intimidation all parties acknowledge Barahona faced in this case. *Ante* at 9-10. However, the requirement of an "act"—"something done or performed," Black's Law Dictionary 27 (9th ed. 2009),[1] should not be conflated with an *excuse* for conduct for which an individual would otherwise be liable:

> If a person manipulates the hand of another in such a way as to cause a crime to be committed, the latter person is guilty of no crime because he has *performed no act*. On the other hand, if a person threatens another with harm unless he commits a crime, and thereby causes the crime to be committed, the coerced person has performed an act, [though duress may excuse the act].

---

[1]Other relevant legal definitions of act include: (1) from criminal law, "a bodily movement whether voluntary or involuntary," Model Penal Code § 1.13; and from civil law, "an external manifestation of the actor's will," Restatement (Second) of Torts § 2.

1 Charles E. Torcia *Wharton's Criminal Law* § 52 (15th ed. 2011) (emphasis added). Moreover, our justice system has long distinguished between *committing* an act and *failing* to act. *See, e.g.*, 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.2 (2d ed. 2008) ("For criminal liability to be based upon a failure to act it must be found that there is a duty to act—a legal duty and not simply a moral duty."); Restatement (Second) of Torts § 314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.").

Here, the Immigration Judge, whose decision was adopted and supplemented by the Board of Immigration Appeals, made the following factual findings:

> The material support at issue in this particular case . . . is [Barahona] has testified that the guerrillas did make use of his kitchen to cook their food . . . during approximately one year. I will state also that he did state that he gave guerrillas directions and showed them shortcuts, but it is the opinion of the Court that would not have constituted material support to the guerrillas. There is no evidence he was trying to help them on any military missions. . . . I will make a factual finding that [Barahona] was living in occupied territory of the guerrillas, that he had no choice as to whether or not to let them use his house . . . and, therefore, I would find, as a factual matter, that there was duress in this case.

J.A. 327-28. The Immigration Judge concluded that because, "[u]nfortunately, the law as it stands today, provides no defense for duress," Barahona had violated the Material Support Bar and was, consequently, ineligible for relief.[2] The

---

[2]The Immigration Judge further remarked that: "I want to make clear were it not for this material support issue I would have found the respondent meets the criteria of relief under [section] 203 of NACARA, and I would urge whoever is making the decision, Department of Homeland Security, to allow the duress exception." J.A. 328.

Board of Immigration Appeals agreed and ruled that, due to the lack of a duress exception or voluntariness requirement, Barahona violated the Material Support Bar by allowing the guerrillas to use his kitchen. It is this legal conclusion, affirmed by the majority opinion, with which I take issue, as I find that Barahona need not plead either duress or involuntariness when he can be "guilty of no crime because he has performed no act." Torcia, *supra* § 52. Nowhere in the record before this Court is there any suggestion that Barahona took any affirmative step, or otherwise performed or did any deed, that he "kn[ew], or reasonably should [have known], afford[ed] material support" to the guerillas. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc).

Rather, the Immigration Judge and the Board of Immigration Appeals essentially found that—under threat of death—Barahona *did not prevent* the guerillas from occupying his home and using his kitchen to prepare their meals for approximately a year. Yet the plain language of the statute refers only to whether the individual "*commit[s]* an act," 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc) (emphasis added). A failure to act should not be equated with—or read into—that phrase. *See e.g.*, *Midi v. Holder*, 566 F.3d 132, 136-37 (4th Cir. 2009) (noting that under the standard from *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984), "we initially examine the statute's plain language; if Congress has spoken clearly on the precise question at issue, the statutory language controls.").

To apply the Material Support Bar to a failure to act, such as in Barahona's case, runs contrary both to our justice system's longstanding distinction between committing an act and failing to act, discussed above, and to the well-established tenet that we should construe statutes to avoid absurd results. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Consider, for example, that the majority opinion's holding would still bar Barahona from relief even had he immediately fled his home and never returned, and the guerillas had used his home in his absence, yet he reasonably should have known they would occupy and use his home once he left. Likewise, he would not be eligible for relief even if he had taken some sort of action to prevent the guerillas from being able to prepare meals, such as sabotaging his stove, if they instead used his fireplace. Such cannot be the intent of Congress, when the statute specifically provides that an individual must "commit an act" that "affords material support."[3]

## II.

José Barahona lost his home, members of his family, and his homeland to guerilla terrorists. Under today's ruling, he will now lose his adopted country. Because I find that the plain language of the Material Support Bar requires that Barahona have "commit[ted] an act"—beyond simply being the unfortunate victim of terrorists—to deny the relief he seeks, I must respectfully dissent.

---

[3]Indeed, every case cited by the Board of Immigration Appeals, in support of its duress analysis or otherwise, involves the commission of an act. *See, e.g.*, *Arias v. Gonzales*, 143 F. App'x 464, 466-68 (3d Cir. 2005) (making voluntary payments); *Matter of S-K-*, 23 I&N Dec. 936, 937 (BIA 2006) (donating money); *Singh-Kauer v. Ashcroft*, 385 F.3d 293, 298 (3d Cir. 2004) (providing food).